UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

MARKET NEWS INTERNATIONAL, INC.,      :

         Plaintiff,                :

        -against-                      :      05 Civ. 9482 (RMB)

GARY ROSENBERGER, d/b/a ECONOPLAY,    :      **ORDER**

         Defendant.                :

------------------------------------------------------------------x

I.  **Introduction**

On or about October 27, 2005, Market News International, Inc. ("MNI" or "Plaintiff"), the publisher of a "leading electronic newswire," commenced an action in New York State Supreme Court, New York County, against Gary Rosenberger, "doing business as Econoplay" ("Rosenberger" or "Defendant"). Rosenberger had been a freelance contributor to MNI's newswire of a financial news column entitled "REALITY CHECK." Plaintiff seeks damages and, in the alternative, "a preliminary and permanent injunction enjoining . . . Rosenberger from wrongfully using the REALITY CHECK℠ service mark" on Defendant's competing website. (MNI Complaint, dated October 27, 2005 ("Complaint"), ¶ 1, in <u>MNI v. Rosenberger</u>, Sup. Ct. N.Y. Co., Index No. 603820/2005 ("State Court Action").) MNI asserts claims for trademark infringement under New York common law and the Lanham Act ("Lanham Act") § 43(a), 15 U.S.C. § 1125(a), unfair competition under Lanham Act § 43(a), and for violation of New York's "anti-dilution" statute, New York General Business Law § 368-d. (Complaint ¶¶ 23-46.)

On November 7, 2005, the Hon. Helen E. Freedman issued a preliminary injunction in the State Court Action (upon Defendant's default) enjoining Defendant from using the Reality Check service mark. (<u>See</u> Order in State Court Action, dated Nov. 7, 2005 ("[I]t is hereby

ORDERED, ADJUDGED AND DECREED that defendant is restrained and enjoined, pending the trial of this action, from using the service mark REALITY CHECK$^{SM}$, or any words or combination thereof which are similar thereto, in connection with any electronic or any other publication.").) On November 9, 2005, Defendant removed the action to this Court on the grounds that Plaintiff's (federal) Lanham Act claims vested this Court with subject matter jurisdiction. (See Notice of Removal, dated Nov. 9, 2005.) On November 16, 2005, Rosenberger filed an Answer and Counterclaim asserting false designation of origin of the "Reality Check" mark under Lanham Act § 43(a).

On May 1, 2006, Plaintiff moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), for an order permanently enjoining Defendant from using the Reality Check$^{SM}$ service mark, and stated that, should the Court grant the injunction, Plaintiff "will withdraw the remaining" claims seeking monetary damages. (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, dated May 1, 2006 ("Pl. Mem."), at 2 & n.1.) Plaintiff argues that the only issue in dispute is who owns the Reality Check mark, and that ownership is determined by (i) "who first used the trademark in commerce" and (ii) "who exercised control over the quality of the goods associated with a trademark." (Pl. Mem. at 16.) According to Plaintiff, MNI "first used the mark in commerce" because MNI has "published, distributed, advertised and marketed Reality Check $^{SM}$" since 1995, and MNI controlled the quality of the mark because, among other things, MNI "conceived of the idea for REALITY CHECK$^{SM}$," "[e]very Reality Check$^{SM}$ article ever written by defendant was submitted to the editorial staff of MNI, where any changes were made at MNI's discretion," MNI refused to publish a Rosenberger story on at least one occasion, and MNI assigned the column to other

authors "over 40" times from 1997 through 2005. (Id. at 17-18.)

On June 2, 2006, Defendant filed a Memorandum of Law in Opposition to Plaintiff's Summary Judgment Motion ("Def. Mem.") arguing that the mark's ownership should be determined by "who exercises control over" the mark (Def. Mem. at 5), and that he exercised control because, among other reasons, he wrote 1,500 columns "for over ten years, with only the occasional punctuation edit" (id. at 7), and that in the Spring of 2005, MNI "'acquiesced' to Rosenberger's insisting that stories written by people other than him could not be called Reality Checks" (id. at 8).

On June 16, 2006, Plaintiff filed a Reply Memorandum of Law ("Pl. Reply"). The Court heard (useful) oral argument on October 20, 2006.

**For the following reasons, Plaintiff's motion for summary judgment is denied.**

## II.   Background

"Founded in 1983, MNI is an electronic newswire dedicated to the global fixed-income and foreign exchange markets, and also provides information relevant to the equity markets." (Plaintiff's Local Rule 56.1 Statement, dated May 1, 2006 ("Pl. 56.1"), ¶ 1; Defendant's Local Rule 56.1 Statement, dated June 1, 2006 ("Def. 56.1"), ¶ 1.) "MNI's services and products are available by subscription at http://mni.acquiremedia.com, and are also available via other electronic services which include Reuters, Bloomberg and Telerate." (Pl. 56.1 ¶ 2; Def. 56.1 ¶ 2.) "The Main Wire, one of MNI's products, links readers to feature news stories and columns; among these is a link to MNI's Reality Check$^{SM}$ news series." (Pl. 56.1 ¶ 3; Def. 56.1 ¶ 3.) "Once MNI began to publish the stories in 1995, Reality Check$^{SM}$ became a very popular feature in The Main Wire . . . ." (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 4.)

In 1995, Rosenberger began providing stories to MNI as a "freelance financial journalist" (Declaration of Gary Rosenberger, dated June 1, 2006 ("Rosenberger Decl."), ¶ 3; see id. ¶¶ 4, 23, 29; Def. 56.1 ¶ 11; Declaration of Tony Mace, dated May 1, 2006 ("Mace Decl."), ¶ 12) or "independent contractor" (Pl. 56.1 ¶ 13; Def. 56.1 ¶ 13). Both Rosenberger and Tony Mace, MNI's managing editor ("Mace"), claim to have conceived of the idea behind the Reality Check column, which "was to speak to people who worked in actual businesses and trade associations and not on Wall Street." (Mace Decl. ¶ 11 ("In early 1995, I conceived of the idea for REALITY CHECK℠ after suggesting to Mike Connor, CEO of MNI, that we run a series of stories based on anecdotal reporting on various sectors of the economy."); see Rosenberger Decl. ¶ 7 (Rosenberger claims that "around July 1995," "[s]ix months into [his] relationship with Market News," he told Mace that he "would be more valuable doing stories that would reflect the 'reality' of economic activity by finding and using sources outside Wall Street," and Mace "seemed genuinely excited by the idea.").) Mark Pender, a freelance writer at MNI, claims that Mace told him that Mace and Rosenberger "concocted [Reality Check] together." (Declaration of Mark Pender, dated May 30, 2006, ¶ 4.) Mace appears to have been responsible for naming the column, as Rosenberger submitted an article entitled "something like: Reality Based: US Stores See Soft Spending;" Mace changed the title from "Reality Based" to "Reality Check." (Rosenberger Decl. ¶ 8.)

In the Fall of 1995, Rosenberger declined MNI's offer of "full time employment." (Rosenberger Decl. ¶ 13.) Early in 1996, MNI "assign[ed] to Rosenberger [his] own fixed page on their wire" and again offered to hire him full time, which he again declined. (Id. ¶ 14.) Rosenberger claims that "[a]lthough Market News asked repeatedly, [he] never signed any waiver, release or document that turned over rights to Reality Check . . . ." (Id. ¶ 28.)

According to Rosenberger, some time in 1996 he "suddenly hit upon the formula of covering U.S. economic indicators **before** their release by the government," not in the "usual way of calling Wall Street analysts, but by going directly to the source -- staffing firms for payrolls data, car dealers for auto sales, storekeepers for retail, home builders for housing starts," etc. (Id. ¶ 16.) His "stories would precede all economic indicators rather than follow them," and "Reality Check would become a forecasting tool." (Id. ¶ 17.)

Mace claims that "[e]very MNI REALITY CHECK℠ story ever published is submitted to [Mace] or to another MNI editor who edits them for form, content and length," and that "MNI editors often changed headlines, words, punctuation and grammar in Defendant's . . . stories." (Mace Decl. ¶ 14.) Mace asserts that "Defendant's stories were not always accepted by MNI," and that "Defendant once wanted to do a story on the sex industry that MNI refused to publish." (Id. ¶ 13.) Although Rosenberger concedes that "every story [he] submitted was seen by an editor," he contends that that his "stories were released with minimal, if any, editorial influence . . . ." (Rosenberger Decl. ¶¶ 22-23 (citing Exhs. C and D, copies of Rosenberger's draft of a Reality Check story and the final version containing "perhaps a few punctuation changes"); id. ¶ 25 (Rosenberger "would submit [each story] to Market News editors for a quick proofread that amounted to little more than a modern-day spell check.").) He claims that "[a]ny editing required [his] approval," and that "[o]n the rare occasion when [he] caught heavy-handed editing on the part of a new editor [Rosenberger] would complain and stories would be taken away from the editor forever after." (Id. ¶¶ 22, 24.)

"At no time did Defendant have any capability or authorization to transmit or publish a story out to MNI clients, nor did Defendant do so. The only way Defendant's stories found their way to MNI subscribers was via MNI authorized wire services or internet sites." (Pl. 56.1 ¶ 16;

Def. 56.1 ¶ 16.) "The front page to The Main Wire, where Reality Check<sup>SM</sup> stories can be accessed through MNI's subscription services, links readers to Reality Check<sup>SM</sup> with no mention of the Defendant or any other author." (Pl. 56.1 ¶ 8 (citing Mace Decl. ¶ 15 & Ex. 8); see Def. 56.1 ¶ 8.)[1] "When readers access MNI's stories through Bloomberg, the news story, including all Reality Check<sup>SM</sup> stories, have an MNI identifier attached to it in order for the reader to know that the story emanated from MNI." (Pl. 56.1 ¶ 10 (citing Deposition of Tony Mace, dated March 14, 2006 ("Mace Depo."), at 47-48); see Def. 56.1 ¶ 10.) No MNI "marketing or sales materials ever mentioned Defendant." (Pl. 56.1 ¶ 7; Def. 56.1 ¶ 7.)

According to Plaintiff, from "at least" 1997 through Rosenberger's resignation from MNI in 2005, MNI published "over 40" "Reality Check" stories that had been written by authors other than Rosenberger. (Declaration of Tony Mace, dated Dec. 22, 2005, ¶ 45; Pl. 56.1 ¶ 14 ("At least thirteen writers other than Defendant wrote Reality Check<sup>SM</sup> articles for MNI during Defendant's tenure."); Def. 56.1 ¶ 14.)[2] Rosenberger "objected to Market News using Reality Check for stories [he] had no control over." (Rosenberger Decl. ¶ 33.) Rosenberger "protested to Mr. Mace repeatedly that these other stories are Reality Check in name only," that "they violate almost every rule of [Rosenberger's] column," that "they are poorly written, unimaginative, and reflect poorly on [Rosenberger's] body of work," and that "they confuse the marketplace." (Rosenberger Decl. ¶ 32; see Rosenberger Decl. Exs. G, I, J.) Mace confirms that

---

[1] Because Rosenberger "fail[ed] to specifically controvert [the statement contained in MNI's Rule 56.1 Statement ¶ 8] with citation to contrary admissible evidence in the record, that fact will be deemed admitted." Presser v. Key Food Stores Co-op., Inc., No. 01-CV-8059, 2006 WL 2086346, at *1 (E.D.N.Y. July 25, 2006).

[2] Plaintiff's statement is deemed admitted because Defendant failed to support his denial of the statement with relevant admissible evidence. See Note 1, supra; see also Local Civil Rule 56.1(c)-(d).

"roughly a dozen times" over the course of "several years," Rosenberger "nagged" or "badgered" Mace about "not assign[ing] anyone else to write Reality Check stories." (Mace Depo. at 59-62.) For example, on May 20, 2003, Rosenberger sent Mace an email objecting to any of the European bureaus using the "Reality Check" name. (Rosenberger Decl. Ex. G.) In response, Mace sent Rosenberger an email, dated May 20, 2003, stating "'reality check' is not your personal column and I would be very surprised if many of our readers associated it with you even though I do." (Rosenberger Decl. Ex. G.) On December 8, 2004, Rosenberger again objected to other writers using the Reality Check column title, to which Mace responded: "what I recall of our conversation was that you said you wanted us to use the reality check identifier only on your stories and mike and i said we are sorry you feel that way but that we plan to use it in europe and elsewhere. So I'm still sorry you feel that way." (Rosenberger Decl. Ex. J: emails dated Dec. 8, 2004.)

In the Spring of 2005, Mace "finally acquiesced" to Rosenberger's "protests" and told Rosenberger "okay, okay, I'll call the story something else," and, at some point thereafter, began calling stories coming out of China "Ground Level" and the stories coming out of Europe "Sector Focus." (Mace Depo. at 61; see Declaration of Eric Weinstein, dated June 1, 2006 ("Weinstein Decl."), Ex. A (Email, dated Aug. 22, 2005, from Mace to "John Carter" (who is not identified) stating "Mike . . . can't believe we caved to gary [sic] on who gets to use the reality check identifier."); Mace Declaration, dated Dec. 22, 2005, ¶ 46.) Rosenberger claims that "in the spring of 2005, [he] got from Mr. Mace . . . an ironclad verbal assurance that the practice of others writing Reality Check would end once and for all.'" (Rosenberger Decl. ¶ 37.)

In September, 2005, Mace "reverse[d] what [he] had said to Defendant [Rosenberger] and told the staff to call the [other] stories 'Reality Check' again." (Mace Declaration, dated Dec.

-7-

22, 2005, ¶ 46; see Rosenberger Decl. ¶ 38.) Rosenberger claims to have confronted Mace, stating "I thought we had settled this," to which Mace allegedly responded "I caved into you last spring, and now I plan to 'un-cave.'" (Rosenberger Decl. ¶ 39.) Two weeks later, on October 4, 2005, Rosenberger told Mace that "he no longer wanted to write for MNI" after Mace failed to give him "'absolute written assurance that this will never happen again . . . .'" (Id. ¶ 40; see Mace Decl. ¶ 16.)

On October 5, 2005, without authorization from MNI, Rosenberger independently released a "Reality Check" story to certain MNI customers via email. (Rosenberger Decl. ¶ 41; Pl. 56.1 ¶ 20; Def. 56.1 ¶ 20.) On October 7, 2005, MNI filed an application with the United States Patent and Trademark Office ("PTO") for the "Reality Check" service mark. (Compl. ¶ 7.) Soon thereafter, Defendant began displaying stories under the name "Official Reality Check$^{SM}$" on a website found at www.officialrealitycheck.com., which stories "were nearly identical in substance and format to the ones MNI paid him to write and that MNI continues to publish." (Pl. 56.1 ¶¶ 21-22; Def. 56.1 ¶¶ 21-22.)

In early October, 2005, Defendant's website stated that "Official Reality Check and associated services are registered service marks of Econoplay, Inc." (Pl. 56.1 ¶ 23; Def. 56.1 ¶ 23.) Defendant filed his own trademark application for "Official Reality Check" with the PTO on November 6, 2005. (Id.) In his PTO application, Defendant stated that he first used the "Official Reality Check" mark on October 5, 2005. (Pl. 56.1 ¶ 27; Def. 56.1 ¶ 27.)[3]

---

[3] In an asset purchase agreement, dated in 2004, between MNI and Xinhua Finance, MNI identified its registered and unregistered trademarks but did not include "Reality Check" among them. (See Weinstein Decl. Ex. B: Asset Purchase Agreement; Deposition of MNI through Mike Connor, dated March 9, 2006, at 12-13; Mace Depo. at 34-36.)

**III.    Legal Standard**

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d. Cir. 2000). The moving party bears the initial burden of informing the district court of the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party which must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although evidence must be reviewed "in the light most favorable to the non-moving party . . . , "[a] dispute is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Nabisco, 220 F.3d at 45. "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo v. Prudential Resid. Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV.    Analysis**

"The Lanham Act prohibits the use in commerce, without consent, . . . of unregistered, common law trademarks." Time, Inc. v. Petersen Pub. Co. L.L.C., 173 F.3d 113, 117 (2d Cir. 1999) (citing 15 U.S.C. § 1125(a)(1)). "Trademark infringement is established if the plaintiff proves that '(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services.'" Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3d Cir. 1991) (citation omitted); see also Petersen, 173 F.3d at

117.

Defendant disputes (only) the second element of Plaintiff's infringement claim, i.e., ownership of the "Reality Check" mark. (See Transcript of Oral Argument, dated October 20, 2006.) Plaintiff asserts that "[w]hen a trademark ownership dispute exists, courts have looked to two factors in determining the rightful trademark owner: First, . . . who first used the trademark in commerce. . . . Second, . . . who exercised control over the quality of the goods associated with a trademark." (Pl. Mem. at 16.) Plaintiff claims "prior use" of the Reality Check mark because, among other reasons, MNI has "published, distributed, advertised and marketed Reality Check $^{SM}$" since 1995, while Defendant "never used Reality Check$^{SM}$ in commerce until October, 2005, after he left MNI," and "by Defendant's own admission in his [PTO] application, Defendant did not use 'Official Reality Check' in commerce until October 5, 2005." (Id. at 17; see id. at 15.) Plaintiff also argues that "[a]t all times, MNI controlled the quality of the goods associated with the trademark" because: "[e]very Reality Check$^{SM}$ article ever written by defendant was submitted to the editorial staff of MNI, where any changes were made at MNI's discretion" (id. at 18); Defendant did not have the capability or authorization to transmit . . . a story to MNI clients . . . ." (id.); "Defendant's stories were not always accepted by MNI" (id.); and "MNI assigned and published Reality Check$^{SM}$ articles by other authors" (Pl. Reply at 2, 4).

Defendant counters that "[i]t took [Defendant] years and years to build up [his] reputation as an economic forecaster, financial analyst and financial journalist, and [Defendant's] name is indelibly associated with the name Reality Check." (Rosenberger Decl. ¶ 51.) He claims that Plaintiff erroneously "focuses on who made first use of Reality Check," even though "there was no 'first use' by either party in the traditional sense," as MNI "did not begin publishing" the stories "until Rosenberger wrote them." (Def. Mem. at 6.) He argues that "[i]n the absence of an

agreement, courts focus [solely] on who exercises control over the quality of goods or services" (id. at 5) and that he exercised control because, among other reasons: he "conceived the [Reality Check] idea" (id. at 7); MNI "ceded complete control of Reality Check to Rosenberger," who wrote 1,500 columns over ten years "with only the occasional punctuation edit" (id.); "[t]he fact that Reality Check was on a handful of occasions (out of 1,500 total columns) penned by a hand other than Rosenberger" is "insignificant," as he "objected to any unauthorized use he became aware of" and "was thus exercising his right to editorial control" (id.); and in the Spring of 2005, MNI "'acquiesced' to Rosenberger's insisting that stories written by people other than him could not be called Reality Checks" (id. at 8).

While it is well-settled that "[i]f an employee designs a mark in the course of employment and the employer uses it, . . . the employer is the 'owner' of the mark," J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:36 (4th ed. 2006) ("McCarthy"), it is unclear whether a similar trademark rule governs the work product of independent contractors.[4]

---

[4] And, while freelance authors are accorded certain rights under federal copyright law, see New York Times Co. v. Tasini, 533 U.S. 483, 493-98 (2001); Community for Creative Non-Violence v. Reid, 490 U.S. 730, 740-43 (1989), there are "fundamental differences between copyright law and trademark law," Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 439 n. 19 (1984), as a "trademark is meant to identify goods so that a customer will not be confused as to their source," while "[a] copyright is intended to protect the owner's right in an abstract design or other creative product," EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 63 (2d Cir. 2000) (quoting United States v. Giles, 213 F.3d 1247, 1252 (10th Cir. 2000)); accord Ludden v. Metro Weekly, 8 F. Supp. 2d 7, 17 (D.D.C. 1998) ("[O]wnership of trademark rights springs from use; copyright rights derive from authorship. The two inquiries are quite distinct."). The copyright statute, unlike the Lanham Act, distinguishes between employees and independent contractors. See Reid, 490 U.S. at 740-43 ("The structure of [Copyright Act of 1976, 17 U.S.C.] § 101 indicates that a work for hire can arise through one of two mutually exclusive means, one for employees and one for independent contractors . . . .").

One line of cases, advocated by Defendant, bases ownership of trademarks solely upon which party controls or determines the nature and quality of the goods which have been marketed under the mark in question. See In re Polar Music Int'l AB, 714 F.2d 1567, 1571 (Fed. Cir. 1983) ("Since appellant controls the quality of the goods, it is the source of the goods"); C.V. Starr & Co., Inc. v. American Intern. Group, Inc., No. 06 Civ. 2157, 2006 WL 2627565, at *3 (S.D.N.Y. Sept. 14, 2006); Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688, 696 (S.D.N.Y. 1996); Bell v. Streetwise Records, Ltd., 640 F. Supp. 575, 581 (D. Mass. 1986).

Another line of authority, developed in the context of manufacturer/distributor disputes, includes "control" as one of several determinative factors. Under this approach, where parties contest the ownership of a trademark and no agreement governs, the manufacturer is the presumed owner, but that presumption may be rebutted based upon consideration of the following non-exclusive factors:

1. Which party invented or created the mark.

2. Which party first affixed the mark to goods sold.

3. Which party's name appeared on packaging and promotional materials in conjunction with the mark.

4. Which party exercised control over the nature and quality of goods on which the mark appeared.

5. To which party did customers look as standing behind the goods, e.g., which party received complaints for defects and made appropriate replacement or refund.

6. Which party paid for advertising and promotion of the trademarked product.

McCarthy, § 16:48 (footnotes omitted).[5] "No one of these factors is per se determinative." Id.

---

[5] Accord Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1220 (9th Cir. 1996); Tactica Intern., Inc. v. Atlantic Horizon Intern., Inc., 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001); Wrist-Rocket Mfg. Co. v. Saunders, 379 F. Supp. 902 (D. Neb. 1974), aff'd in part and rev'd in

Under either the "control" approach or the multi-factor approach, there are genuine issues of material fact and Plaintiff's motion should be denied.

**Control**

There is a genuine issue of material fact regarding which party controlled the nature and quality of the Reality Check column. Rosenberger, an independent contractor, "'contract[ed] to do certain work according to his own methods, and without being subject to the control of [MNI] except as to the product or result of his work.'" U.S. Underwriters Ins. Co. v. Congregation Kollel Tisereth, TZVI, No. 99-CV-7398, 2004 WL 2191051, at *7 (E.D.N.Y. Sept. 30, 2004) (emphasis added). MNI exercised control over the "product or result of [Rosenberger's] work" by editing every article (if only for punctuation) and, on at least one occasion, refusing to publish a Rosenberger story (see page 5, supra). From 1997 through the Spring of 2005, MNI exercised control by assigning the column (at least forty times) to other writers over whom Rosenberger had no authority, and when Rosenberger objected, MNI overruled the objection in language asserting MNI's ownership of the column. (See Rosenberger Decl. Ex. G: email from Mace to Rosenberger, dated May 20, 2003 (stating "'reality check' is not your personal column . . . .").) And, when MNI "acquiesced" to Rosenberger's complaints for several months in 2005, MNI did not cede complete control over the column, but continued to edit the column.

On the other hand, Rosenberger developed the column over the course of ten years and 1,500 articles, and has offered evidence that MNI's edits were relatively minor. MNI assigned

---

part, 516 F.2d 846 (8th Cir. 1975); see also Pamela S. Chestek, Who Owns The Mark? A Single Framework For Resolving Trademark Ownership Disputes, 96 Trademark Rep. 681, 681-82, 702-03 (May-June, 2006) (footnotes omitted) ("[T]his 'Wrist-Rocket framework' is well-suited for resolving disputes arising in all types of situations in which two parties claim ownership of the same trademark, including the dissolution of formerly cooperative relationships . . . .").

other writers (only) approximately 2.6% of the time, and seemed to acquiesce in Rosenberger's proprietary claim by agreeing, in 2005, that only columns authored by Rosenberger would be titled "Reality Check." See Liebowitz, 927 F. Supp. at 697 (jury question found where editor-in-chief of academic journals edited the journals and selected the manuscripts for publication, but the publisher retained "some degree of involvement in controlling the quality of the journals").

**Multi-Factor Approach**

The first two factors of the multi-factor approach appear to favor MNI, as the party that both "invented or created the mark" and "first affixed the mark to goods sold." McCarthy, § 16:48. The third factor -- "which party's name appeared on packaging and promotional materials in conjunction with the mark" -- does not entirely favor either party, as MNI's name appeared on the website, on all promotional materials, and in each article, but Rosenberger's name also appeared on the vast majority of articles. As noted, the fourth factor -- which party exercised control over the nature and quality of goods on which the mark appeared -- does not clearly favor either party. The fifth factor -- "to which party did customers look as standing behind the goods" -- also does not clearly favor either party, because the parties have offered only anecdotal evidence that customers associated the column with either MNI or Rosenberger. The sixth factor appears to favor MNI, as the party that "paid for advertising and promotion of the trademarked product." McCarthy, § 16:48.

Taken together, the factors are not so one-sided as to warrant summary judgment. See also McCarthy § 18:58 ("The degree of control exercised by a licensor is a question of fact, which may require a trial rather than be determined on summary judgment."). There exist genuine issues of material fact. See Liebowitz, 927 F. Supp. at 698 ("Plaintiffs have produced evidence which, if credited, would permit a trier of fact to find that they controlled the quality of

the journals' content. The only doubt on defendants' motion is the degree to which defendants were significantly involved in quality control. Thus, defendants have failed to demonstrate that there is no genuine question of fact as to whether the defendants controlled the quality of the journals.").[6]

## V.  Conclusion and Order

For the foregoing reasons, Plaintiff's motion [17] for summary judgment is denied. The parties and counsel are requested to appear at a status/scheduling/settlement conference with the Court on November 21, 2006, at 2:00 p.m., in Courtroom 14A of the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York 10007. **The Court directs the parties to engage in good faith settlement negotiations prior to the conference with the Court.**

Dated: New York, New York
       November 1, 2006

                          _RMB_____
                          **RICHARD M. BERMAN, U.S.D.J.**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/1/06
```

---

[6] With respect to the issues raised in this motion, the standards governing trademark infringement, unfair competition, and trademark dilution are essentially the same under the Lanham Act, New York law, and the common law. See Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 410 nn.6-7 (S.D.N.Y. 2006); Shaw v. Rizzoli Intern. Pub., Inc., No. 96 Civ. 4259, 1999 WL 160084, at *8 (S.D.N.Y. March 23, 1999); Lurzer GMBH v. American Showcase, Inc., 73 F. Supp. 2d 327, 331 n.5 (S.D.N.Y. 1998). Accordingly, summary judgment is denied as to all claims.